690 F.2d 380
 217 U.S.P.Q. 662, 1982-2 Trade Cases 64,960
 BURLINGTON INDUSTRIES, INC. and Madison Throwing Company,
Inc., Plaintiffs-Appellees/Cross-Appellants,
v.
MILLIKEN & COMPANY, Milliken Research Corporation, Chavanoz,
S. A., ASA, S. A. and ARCT, Inc.,
Defendants-Appellants/Cross-Appellees.
(four cases)
The DUPLAN CORPORATION, et al., Plaintiffs,
v.
DEERING MILLIKEN, INC., Deering Milliken Research
Corporation, Moulinage et Retorderie de Chavanoz,
Ateliers Roannais de Constructions
Textiles, and ARCT, Inc.,
Defendants. (four cases)
 Nos. 81-1823 to 81-1825 and 82-1240.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1982.
Decided Sept. 23, 1982.
 
 Jay Topkis, New York City (Simon H. Rifkind, Steven B. Rosenfeld, Gerard E. Harper, Mary Lu Bilek, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on brief), Griffin Bell, Atlanta, Ga. (Howard E. Manning, Sr., Manning, Fulton & Skinner, Raleigh, N. C., on brief), for defendants-appellants/cross-appellees.
 David L. Foster, New York City (Michael C. Lambert, James J. Calder, Jonathan P. Wolfert, Willkie, Farr & Gallagher, New York City, on brief), William K. West, Jr., Washington, D. C. (W. Warren Taltavull, Cushman, Darby & Cushman, Washington, D. C., on brief), McNeill Smith, Greensboro, N. C. (Michael R. Abel, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for plaintiffs-appellees/cross-appellants.
 Before WINTER, Chief Judge, and BUTZNER and HALL, Circuit Judges.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 This is an antitrust case in which the district court found a continuing horizontal antitrust conspiracy to stabilize and maintain production royalties on false twist machines and to monopolize the United States market for these machines.[1] The core of the conspiracy was a 1964 settlement agreement of certain patent litigation then pending between Leesona Corporation (a nonparty to the present case) and defendants which had the effect, as found by the district court, of stabilizing and maintaining the royalties charged by the coconspirators. After we modified the district court's determination of liability to include all defendants, Duplan Corp. v. Deering Milliken, Inc., 594 F.2d 979 (4 Cir. 1979), cert. denied, 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980), the district court decided the issue of damages. Initially it awarded plaintiffs treble damages in the aggregate sum of $20,902,005.39, and all parties appealed. While the appeals were pending, we remanded the case to the district court at its request to enable it to reconsider its ruling, and the district court reduced its award to $7,462,211.67. The previous appeals from the damage award and an appeal from the order reducing damages are now before us. We vacate the award and remand the case for further proceedings.
 
 I.
 
 2
 The facts of the case were extensively found by the district court prior to the previous appeal. Duplan Corp. v. Deering Milliken, Inc., 444 F.Supp. 648 (D.S.C.1977). We will repeat them only insofar as they bear on the issues before us and then only in connection with the issues to which they relate. From the several appeals, there are seven issues that we must consider:
 
 
 3
 1. Whether the district court properly applied the measure of damages and correctly excluded evidence proffered by defendants as to the price plaintiffs would have paid for false twist equipment absent the price-fixing conspiracy.
 
 
 4
 2. Whether defendants should have been permitted to prove, in the damages phase of the trial, that plaintiffs participated in the price-fixing conspiracy and are therefore barred from all recovery.
 
 
 5
 3. Whether plaintiffs are estopped from recovering royalty-based damages because of their role in other litigation which resulted in a ruling that Leesona's patents were valid.
 
 
 6
 4. Whether the district court properly applied the statute of limitations to plaintiffs' antitrust claims.
 
 
 7
 5. Whether plaintiff Madison Throwing Company, Inc. (Madison) may recover damages sustained by a wholly-owned subsidiary of Madison which was merged into Madison during the pendency of the litigation.
 
 
 8
 6. Whether the district court erred in calculating the value of support services provided to plaintiffs by defendant Deering Milliken Research Corporation (DMRC) and Leesona Corporation (Leesona) during the damages period, and in excluding that value from the royalty-based damages before trebling.
 
 
 9
 7. Whether the district court erred in recognizing a defense of "claim reduction," whereby it reduced the initial award against defendants by excluding treble damages attributable to Leesona on the grounds that plaintiffs had settled with Leesona in a related case.
 
 
 10
 We address these issues seriatim.
 
 II.
 
 11
 To approach the issue of whether the measure of damages recoverable by plaintiffs was properly applied and to consider whether the district court erred in excluding evidence proffered by defendants on the matter of damages, it is necessary to describe the context in which these questions arise.[2]
 
 
 12
 Defendant Moulinage et Retorderie de Chavanoz (Chavanoz) owned patents covering specific features of false twist machinery and thus had the right to make, use and sell machinery incorporating the patented features. It divided up its rights by licensing defendant Ateliers Roannais de Constructions Textiles (ARCT-France) to make and sell patented machines, while licensing DMRC to use the patented machines in the United States. ARCT-France issued a sublicense to Whitin Machine Works (Whitin) enabling it to sell the machinery in the United States. Whitin fixed its own price for the machines it sold, but agreed to sell only to purchasers approved by Chavanoz or DMRC. At a later date, ARCT, Inc. (ARCT) was incorporated to be the exclusive American distributor of machines manufactured by ARCT-France. Like Whitin, ARCT sold machines only to purchasers who were licensed to use them. DMRC issued sublicenses to throwsters to enable them to operate the machines purchased from Whitin and ARCT. DMRC required its use sublicensees to pay royalties based on the amount of yarn produced on the machines, and DMRC was required by the provisions of its license from Chavanoz to pay a portion of these production royalties to Chavanoz.
 
 
 13
 Plaintiffs Burlington Industries, Inc. (Burlington) and Madison[3] are throwsters who purchased ARCT machines from Whitin and obtained use sublicenses from DMRC. They thus paid Whitin a given sum for the purchase of the machines and DMRC a royalty for the use of the machines. A portion of what was collected by DMRC was remitted to Chavanoz.
 
 
 14
 At the time that Chavanoz's patented device was introduced into the American market, Leesona was the sole established competing manufacturer and distributor of false twist equipment. It, too, charged its throwster customers a production royalty for the use of its machines. The royalties charged by Leesona were roughly comparable to those charged by DMRC. Leesona sued Whitin for patent infringement in 1960, and the suit was settled in 1964 when the competing patent owners exchanged covenants not to sue each other or their respective licensees. In the liability phase of the present case, the district court found that the effect of the settlement was to fix royalties on false twist equipment to the detriment of plaintiffs. Having been affirmed in a previous appeal, that finding and the resulting liability are no longer at issue.
 
 
 15
 Prior to the trial on damages, the district court, on motion of the plaintiffs, ruled on the scope of the damages inquiry. It held that "proof of the payment of royalties by the plaintiffs following the illegal combination found to have existed between DMRC and Leesona sufficed to establish the fact of damage, and ... proof of the amount of such royalties ... will suffice to establish a prima facie case of actual damages subject to diminution by the value of any considerations received by the plaintiffs in return for the royalties such as 'support services' allegedly furnished plaintiffs by DMRC during the damages period." In pursuance of that concept, the district court awarded Burlington and its subsidiary Madison, for the various periods of liability, treble the royalties they had paid to DMRC and Leesona, diminished only by the value of support services furnished by DMRC and Leesona and an amount received by Burlington from Leesona in settlement of separate but related litigation. In accordance with our mandate in the prior appeal, the judgment was entered against all defendants. Although Leesona is not a party to the case, royalties which plaintiffs paid to it were treated as an item of damage against the other defendants on the theory that they were coconspirators with Leesona and hence were jointly and severally liable for the entire damage to the victims of the conspiracy.
 
 
 16
 This appeal presents no dispute about the governing principle for the measurement of damages in a price-fixing case. Plaintiffs are entitled to recover the overcharge stemming from the illegal combination-i.e., the difference between the prices actually paid and the prices that would have been paid absent the conspiracy. See, e.g., The Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 489, 88 S.Ct. 2224, 2228, 20 L.Ed.2d 1231 (1968); American Crystal Sugar Co. v. Mandeville Island Farms, Inc., 195 F.2d 622, 625 (9 Cir.), cert. denied, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952); 15 J. von Kalinowski, Antitrust Laws and Trade Regulation P 115.03(3), at 115-27 (1982); see also Phillips v. Crown Central Petroleum Corp., 602 F.2d 616, 632-33 (4 Cir. 1979), cert. denied, 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980). The district court recognized this abstract measure. It ruled, however, that in the circumstances of this case the entire amount of royalties paid to the coconspirators constitutes an overcharge and hence is recoverable as damages. Having made this ruling, the district court saw no need for further inquiry into the amount which plaintiffs would have paid for the purchase and use of false twist machinery in the absence of the royalty-maintenance conspiracy. It permitted discovery only as to the amount of royalties actually paid and the value of off-setting support services, and it refused defendants' offer to prove that the actual royalties paid did not in fact equal the amount of the overcharge resulting from the conspiracy.[4]
 
 
 17
 The sole precedent directly on point is contrary to the district court's ruling. Alden-Rochelle, Inc. v. American Society of Composers, Authors & Publishers, 80 F.Supp. 888 (S.D.N.Y.1948), concerned a claim for damages arising from ASCAP's licensing program, which had been held to violate the antitrust laws. Plaintiffs argued that, because the licensing scheme constituted unlawful price-fixing, they were entitled to recover all of the license fees which they had paid. This theory was rejected with the statement that an antitrust plaintiff cannot rest on a showing of injury, but must also demonstrate the basic facts from which a court may reasonably approximate the amount of his damages. See id. at 898. In words that are striking for their implications in the present case, the Alden-Rochelle court concluded: "A plaintiff does not satisfy that burden by offering no proof at all, except what he paid the violator." Id. Cf. Yoder Brothers, Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1376 & n.29 (5 Cir. 1976) (upon proof of an antitrust conspiracy by patent holders, the finder of fact should consider both the "total amount of royalties paid" and evidence of what a " 'reasonable' royalty rate" would have been), cert. denied, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977).
 
 
 18
 Both legal and economic logic support the rule articulated in Alden-Rochelle and require its application here. As the district court indicated in the liability phase of this case, the payment of production royalties to DMRC and Leesona "constituted in effect a part of the purchase price for machines." Accord, In re Yarn Processing Patent Validity Litigation, 541 F.2d 1127, 1136 (5 Cir. 1976), cert. denied sub nom. Lex Tex Ltd. v. Universal Textured Yarns, Inc., 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977). Implicit in the notion that royalties were essentially deferred components of a comprehensive sales price, which also included an initial lump-sum payment, is the possibility that the lump sum might have been increased to make up for a loss of royalties. This is particularly clear in Leesona's case, since it directly charged manufacturers of its equipment a royalty on manufacturing licenses and throwsters a royalty on use licenses. Hence, if Leesona had been unable to maintain its use royalties, it might have responded by increasing manufacturing royalties or its initial sales price, subject only to market constraints. See id. The same factors were potentially at work in Chavanoz's licensing and distribution scheme. ARCT-France, ARCT, Whitin, and DMRC were all branches of a single stem springing from the patent owner, Chavanoz. A portion of all royalties, together with a portion of the lump-sum purchase price paid by a throwster for false twist equipment, ultimately was paid to Chavanoz. If Chavanoz had lost the ability to share in deferred compensation in the form of royalties, it would have had a strong economic incentive to increase its portion of the lump-sum initial purchase price. Whether and to what extent it could have done so are difficult factual issues which have not yet been determined and which cannot be determined without a full trial.
 
 
 19
 The district court found in the liability phase of the proceedings that the coconspirators' respective royalty programs were economically interdependent, and that defendants entered into a collusive settlement of their patent litigation precisely because they knew that an adjudication ending Leesona's power to charge royalties would also, by altering the terms of competition, have destroyed the ability of Chavanoz and DMRC to command royalties. Those findings established the fact of injury, but it is an untenable leap of logic to suggest that they establish the extent of the damages. A full-fledged damages trial may reveal that the coconspirators did not in fact possess the leverage to recoup lost royalties in another form. But the accuracy of that conclusion turns on a host of market factors which have yet to be explored. Without a test of the evidence, the plaintiffs' damages cannot fairly be equated with the royalties actually paid.
 
 
 20
 We hold that the district court erred in using the actual royalties paid as the measure of damages without considering whether royalties or some other compensation would have been payable absent the illegal conspiracy. Accordingly, we vacate the damage award and remand the case for further proceedings. On remand, the district court should permit reasonable discovery and conduct a thorough factual inquiry into the difference, if any, between the overall price which throwsters were required to pay in the context of the royalty-maintenance conspiracy and the overall price they would have paid in an untainted market.[5] We recognize, however, that antitrust damages can only be approximated and that antitrust coconspirators should be prevented from unfairly exploiting the complexity of factual issues occasioned by their unlawful conduct. See, e.g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65, 66 S.Ct. 574, 579-580, 90 L.Ed. 652 (1946); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927). Hence, we further hold that the royalties actually paid may serve as a prima facie estimate or "yardstick" of damages, which defendants must overcome with persuasive evidence. Cf. Phillips v. Crown Central Petroleum Corp., 602 F.2d at 632-33; Yoder Brothers, Inc. v. California-Florida Plant Corp., 537 F.2d at 1376 & n.29. But defendants must be afforded the opportunity to prove that the actual royalties paid do not in fact equal the overcharge which is the true measure of plaintiffs' damages.III.
 
 
 21
 In the damages aspect of the trial, defendants sought to prove that Burlington (a) secretly obtained the use of unlicensed false twist equipment and thereby gained a cost advantage over its competitors, who were obliged to pay royalties to defendants; (b) caused the supplier of the unlicensed equipment to settle a patent infringement suit brought by Leesona and to become a licensee of Leesona; and (c) thereafter preserved its cost advantage by inducing the supplier to kick back to Burlington royalties which the supplier received by virtue of its license. Defendants contended that such proof might bar all recovery and would at least require the district court to exclude from any award the royalties which Burlington paid Leesona. The district court rejected defendants' proffer but excluded the kickbacks received by Burlington from the damage award before trebling.
 
 
 22
 In our view, the district court ruled correctly. In essence defendants raise the affirmative defense of in pari delicto. See Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3, 15-16 (4 Cir. 1971).[6] The nature of that defense is not altered by the fact that defendants cast it in the language of "damage causation," arguing that Burlington caused its own injury and is thus precluded from recovering damages. Significantly, successful assertion of the in pari delicto defense does not merely reduce a plaintiff's compensable damages; instead, it bars the plaintiff from any recovery. See id. at 16. Thus the defense goes to the issue of liability-an issue finally settled in this case-rather than to the extent of the damages. We hold therefore that proof of Burlington's alleged misconduct was not timely and was properly excluded. We see no reason to reopen the liability phase of the case at this late date.
 
 
 23
 Even if the in pari delicto defense could properly be raised in the damages phase of the trial, defendants could not successfully avail themselves of the doctrine. Proof that Burlington contrived to elude defendants' royalty exactions and thus secured a competitive advantage in the throwster industry is not enough to establish the defense. Rather, the defense would require proof that Burlington "mutually participate(d) in the formulation and execution of the scheme and (bore) equal responsibility for the consequent restraint of trade." Columbia Nitrogen Corp., 451 F.2d at 15-16. Defendants have produced no proof in the liability phase of the trial that Burlington played any role in the collusive settlement by which they fixed royalties and violated the antitrust laws; nor do they allege it now. These omissions are fatal to the in pari delicto defense, especially since that doctrine retains only narrow application in the antitrust setting after Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). See id. at 140, 88 S.Ct. at 1985 ("once it is shown that the plaintiff did not aggressively support and further the monopolistic scheme as a necessary part and parcel of it, his understandable attempts to make the best of a bad situation should not be a ground for completely denying him the right to recover which the antitrust acts give him"); id. at 145-46, 88 S.Ct. at 1987-1988 (White, J., concurring); see also id. at 154-55, 88 S.Ct. at 1992-1993 (Harlan, J., concurring and dissenting).
 
 
 24
 We emphasize that, to the extent that Burlington was able to reduce its injuries by obtaining a price reduction in the form of kickbacks of royalties earned by its supplier as a licensee of Leesona, these savings were properly deducted from the damage award before trebling. See id. at 140, 88 S.Ct. at 1985 (opinion for the Court). Defendants offered no more precise method of valuing the benefits gleaned by Burlington, and this measure suffices under the rule of approximation which is applicable to antitrust damages. See generally Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65, 66 S.Ct. 574, 579-580, 90 L.Ed. 652 (1946).
 
 
 25
 It has been suggested that defendants should be permitted to prove Burlington's alleged misconduct as part of the damages phase of the case because Burlington's scheme was distinct from the conspiracy between defendants which was the subject of the liability trial. If Burlington's misconduct other than direct participation in the antitrust conspiracy is asserted as a defense, defendants can only be understood as raising the equitable defense of unclean hands. It is well settled that unclean hands is no bar to antitrust recovery. See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951); Perma Life Mufflers, Inc., 392 U.S. at 138, 88 S.Ct. at 1984; id. at 143, 88 S.Ct. at 1986 (White, J., concurring); id. at 154-55, 88 S.Ct. at 1992-1993 (Harlan, J., concurring and dissenting). If, as is far from clear, Burlington's alleged conduct amounted to a violation of law, Burlington may be vulnerable to prosecution or held liable by a party injured as a result of the violation. But defendants cannot avoid liability to Burlington for their own antitrust conspiracy by alleging that Burlington is culpable for a distinct infraction.
 
 IV.
 
 26
 Leesona's patent infringement suit against Burlington's supplier of unlicensed false twist equipment terminated in a consent decree, entered in 1963, which recited the validity and infringement of Leesona's patents. Although Burlington was not a party to that suit, the district court found that it "orchestrated" the settlement which led to the consent decree. Defendants argue that since plaintiffs earlier caused an adjudication of the validity of Leesona's patents, the doctrine of collateral estoppel now precludes them from employing a damages theory which assumes that the patents would have been invalidated in the absence of conspiracy.
 
 
 27
 This issue may become moot if, on remand, defendants prove that royalties are not a reasonable measure of damages in the first place. The question calls for decision now, however, since we have held that royalties may be used as prima facie evidence of damages, subject to rebuttal.
 
 
 28
 We reject defendants' estoppel argument for two reasons. First, the validity or invalidity of the patents is not an essential element of defendants' proven antitrust violation. The conspiracy to fix royalties would have been unlawful even if the patents giving rise to the royalties were valid. The conspiratorial settlement was illegal, not because it forestalled a legal challenge to the patents, but because it served as a vehicle for collusive restraint of trade.
 
 
 29
 Second, the consent decree which defendants contend gives rise to an estoppel was rendered in 1963; the conspiratorial settlement between defendants and Leesona was not effected until 1964. Plaintiffs' urging the validity of Leesona's patents in 1963 scarcely estops them from arguing that the patents were misused in a subsequent antitrust violation. Thus, even if plaintiffs may not argue that the patents were always invalid, they may claim royalty-based damages under the Clayton Act on the theory that the patents became unenforceable in 1964 because of their misuse in an antitrust conspiracy.
 
 V.
 
 30
 In the liability phase of this case, the district court correctly ruled that plaintiffs would be entitled to recover "all damages which plaintiffs may show have been sustained within four years preceding their suits resulting solely from acts of the defendants committed during the four-year period." See 15 U.S.C. § 15b (1976). We turn now to the application of that rule in the particular circumstances of this litigation.
 
 
 31
 In the thirty-seven separate actions which were consolidated and resulted in the case before us, Burlington first pleaded an antitrust violation on February 16, 1970, in a counterclaim to a suit filed against it by DMRC on December 19, 1969. DMRC had sued for Burlington's alleged breach of its license agreement with DMRC and had also prayed for a declaratory judgment that the agreement was enforceable. Burlington's answer both asserted an independent antitrust counterclaim and raised the alleged antitrust violation as a defense to enforcement of the agreement. DMRC filed an identical suit against Madison on January 29, 1970, and Madison answered on February 23, 1970, with an antitrust counterclaim and an antitrust defense similar to those asserted by Burlington. The district court held that Burlington's and Madison's antitrust claims related back to the dates of DMRC's respective complaints. It therefore permitted Burlington to recover for the period beginning four years prior to December 19, 1969, and Madison to recover for the period beginning four years prior to January 29, 1970.
 
 
 32
 We think that the district court was correct in its ruling. Burlington's and Madison's antitrust claims against DMRC arose out of the very transaction which was the subject matter of DMRC's complaint-namely, the licensing agreement imposed by DMRC. Thus, the antitrust claims were compulsory counterclaims under Rule 13(a), F.R.Civ.P. In our view, Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944), does not require a different conclusion. Justice Douglas's opinion in that case treated antitrust and patent misuse claims as merely permissive counterclaims in response to a complaint for patent infringement. See id. at 671, 64 S.Ct. at 273. The opinion has been read narrowly in this respect, and its continuing validity is open to serious question. See, e.g., United States v. Eastport Steamship Corp., 255 F.2d 795, 805 (2 Cir. 1958); Martino v. McDonald's System, Inc., 432 F.Supp. 499, 505 (N.D.Ill.1977), aff'd, 598 F.2d 1079 (7 Cir. 1979); 3 Moore's Federal Practice P 13.13, at 13-306 n.22 (2d ed. 1982); 6 C. Wright & A. Miller, Federal Practice and Procedure § 1412, at 61-64 (1971). In Mercoid, moreover, unlike the instant case, the complaint did not demand a declaratory judgment on the issue of the enforceability of the patents or of any license agreement under which those patents were licensed. Mercoid is thus distinguishable, even if it remains good law.
 
 
 33
 Unlike Rule 15(c), Rule 13(a) contains no mention of relation back. Nonetheless, the better view holds that "the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim." 6 C. Wright & A. Miller, supra, § 1419, at 109 (footnote omitted).
 
 VI.
 
 34
 Prior to the commencement of this suit, plaintiff Madison had a wholly-owned subsidiary named Fedelon Throwing Corporation (Fedelon). Fedelon was never a party to this litigation, but it was merged into Madison during the liability phase of the trial. During the limitations period applicable to Madison's antitrust claims, Fedelon paid Leesona approximately $600,000 in royalties. In computing damages, the district court refused to make any award to Madison on account of injuries to Fedelon. We think that this was error.
 
 
 35
 Defendants concede that, under state law, Madison succeeded automatically to the claims of its merged subsidiary and was entitled to sue on those claims in its own name. However, they note that some state courts require a consolidated company, suing on the claim of a constituent company, to plead "performance of conditions precedent to its" consolidation. 15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7179, at 327 (rev. perm. ed. 1973) (footnote omitted). And they insist that, as a matter of due process, Madison was required to serve explicit notice that part of its damages claim was derived from Fedelon.
 
 
 36
 Under the federal rules, an affirmative pleading need set forth only "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2), F.R.Civ.P. The essential purpose of Rule 8 is to afford "the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved." 5 C. Wright & A. Miller, supra, § 1215, at 109-110 (footnote omitted). In pursuit of that goal, the rule eschews needless technicalities. Id. at 109. By this standard, the controlling question would appear to be whether Madison worked any significant prejudice on defendants by neglecting to give them special notice of Fedelon's claims.
 
 
 37
 Defendants argue strenuously that they were unfairly surprised by Madison's failure to make clear, until the damages phase of the trial, that it was seeking damages for Fedelon's royalty payments. They insist that such disclosure was required before the adjudication of liability to afford them a real opportunity to defend or compromise these claims. Defendants maintain that they cannot be charged with prior knowledge of Fedelon's royalty payments, since those monies were not paid to them but rather to Leesona. They note, moreover, that the pleadings were inconsistent in the treatment of subsidiaries which were merged into a named plaintiff during the litigation: just as Fedelon was a subsidiary of Madison, Madison was a subsidiary of Burlington; unlike Fedelon, however, Madison was named as a plaintiff, and it remained a party even after it was merged into Burlington. See note 3 supra.
 
 
 38
 These arguments demonstrate no actual prejudice. The liability phase of the trial did not require plaintiffs to separate out their various items of damage. Instead, it focused primarily on the relationship among the various defendants. There is thus no reason to believe that defendants could have tailored any defenses specifically against Fedelon. Rather, the defenses which would have been available against Fedelon were the very ones which defendants asserted without success against the named plaintiffs. It must be emphasized, moreover, that Fedelon was wholly owned by Madison. As a practical matter, defendants' chances of compromising Fedelon's claims were no better than their chances of settling with Madison.
 
 
 39
 It may well have been better practice for Madison to give specific notice of Fedelon's claims. In some circumstances, the failure to do so would undoubtedly be prejudicial. For example, if a corporate litigant filed suit and then bought up the dormant claims of other entities to save them from being time barred, the defendant could justifiably cry foul. But no such abuse is apparent here. We therefore hold that Madison may recover for injuries to Fedelon sustained during the period not barred by limitations.
 
 VII.
 
 40
 As we have stated in Part II, the district court, in fixing the standard by which damages would be assessed against defendants, left open the possibility that royalty-based damages would be reduced "by the value of any considerations received by the plaintiffs in return for the royalties such as 'support services' allegedly furnished plaintiffs by DMRC during the damages period." In the damages trial which ensued, the defendants presented evidence that they provided substantial support services. DMRC offered evidence that it provided machine start-up and operator training, development of processing specifications, physical testing of yarn and fabrics, and other technical assistance. There was also evidence that Leesona continuously rendered technical services to its false twist machinery customers, primarily with respect to the mechanical features and operation of its machines.
 
 
 41
 Defendants' evidence of the extent of the services they provided and their worth was sharply contested by plaintiffs. The memorandum opinion of the district court demonstrates, not only that it was fully cognizant of the conflict, but also that it gave careful consideration to the evidence presented by both sides. On the basis of all of the evidence, the district court concluded that "the defendants are entitled to a credit of ten per cent of the royalties paid DMRC and five per cent of the royalties paid Leesona by Burlington and Madison, the same to be deducted from the amounts of the royalties paid before trebling." Applying this method, the district court valued the relevant services provided by DMRC at $276,378.21 and those provided by Leesona at $171,147.14.
 
 
 42
 We affirm this aspect of the damages case. The support services could properly be taken into account in measuring plaintiffs' injury, and the district court's findings as to the extent and worth of the services are not clearly erroneous.[7]
 
 
 43
 It should be noted that we review this aspect of the district court's ruling because of our holding that the royalties actually paid may serve as a prima facie estimate of damages. If, after the evidentiary hearing that we require, royalties are ultimately adopted by the district court as the proper measure of damages, they should be reduced by the value of the support services. But if another measure of damages is employed, the value of support services should be considered as affecting the price that plaintiffs would reasonably have been required to pay absent the illegal conspiracy.
 
 VIII.
 
 44
 The reduction of the judgment from $20,902,005.39 to $7,462,211.67 occurred because the district court ultimately decided to embrace and apply the defense of "claim reduction." We turn now to consideration of this defense.
 
 
 45
 Burlington did not join Leesona in this action. Burlington, however, had earlier sued Leesona in a separate suit based upon the same antitrust theories and damages that are presented in the instant case. Burlington settled that litigation for the sum of $789,638.82.
 
 
 46
 In its original judgment, the district court deducted the amount that Burlington received in settlement from Leesona from the damages awarded Burlington against defendants here. This adjustment was made after trebling Burlington's total damages. In effect, then, the original judgment permitted Burlington to recover everything it had paid to Leesona (less the adjustment for support services), as well as DMRC, but it precluded double recovery of settlement proceeds actually received from Leesona. When the district court amended the judgment to give effect to the defense of claim reduction, it eliminated all recovery of sums paid to Leesona. This, of course, obviated the question of any credit for the amount Burlington received in the Leesona settlement.
 
 
 47
 We think that the district court erred in recognizing the defense of claim reduction. Section 4 of the Clayton Act provides that a plaintiff "shall recover threefold the damages by him sustained" as a result of an antitrust violation. 15 U.S.C. § 15 (1976). From the earliest days of the Sherman Act, courts have treated antitrust violations as akin to torts, and have therefore applied to treble-damage awards the common-law rule that tortfeasors who act in concert to commit a wrong are jointly and severally liable for the entire amount of the resulting damages. See City of Atlanta v. Chattanooga Foundry & Pipeworks, 127 F. 23, 26 (6 Cir. 1903), aff'd, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). Under traditional principles of compensation, however, a coconspirator is entitled to the defense of payment to the extent of any sum received by the plaintiff in settlement with another coconspirator. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 348, 91 S.Ct. 795, 811, 28 L.Ed.2d 77 (1971). To reconcile this defense with the treble-damage mandate of the Clayton Act, the heretofore unbroken rule has been that any settlement payments are deducted from the damages award after trebling. Flintkote Co. v. Lysfjord, 246 F.2d 368, 397-98 (9 Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); accord, Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc., 635 F.2d 118, 130 (2 Cir. 1980), aff'd, --- U.S. ----, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982).[8] No court of which we are aware has ever applied the theory of claim reduction in an antitrust treble-damage action.
 
 
 48
 In espousing the defense of claim reduction, the district court recognized the settlement as a complete bar to defendants' joint and several liability for Leesona's participation in the price-fixing conspiracy. It did so to avoid what it perceived to be the unfairness which would result from applying the conventional rule in the circumstances of this case.
 
 
 49
 Two recent decisions by the Supreme Court bear on the merits of the district court's ruling. In Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), the Court declined to create an implied cause of action for contribution among antitrust coconspirators. Although the narrow holding of Texas Industries does not expressly foreclose a defense of claim reduction, the opinion rests on principles which are inconsistent with such a defense. For example, the Court observed that proponents of contribution "presuppose a legislative intent to allow parties violating the law to draw upon equitable principles to mitigate the consequences of their wrongdoing," id. at 635, 101 S.Ct. at 2064, whereas "(t)he very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers," id. at 639, 101 S.Ct. at 2066. The Court emphasized that "(t) here is nothing in the (Clayton Act) itself, in its legislative history, or in the overall regulatory scheme to suggest that Congress intended courts to have the power to alter or supplement the remedies enacted." Id. at 645, 101 S.Ct. at 2069. Finally, the opinion stressed that the contribution question implicates complex policy issues which are more properly decided by legislation than by judicial decision. Id. at 646-47, 101 S.Ct. at 2069-2070.
 
 
 50
 The same theme runs through the second case, American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., --- U.S. ----, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). That case held a nonprofit professional society liable for treble damages for a violation of § 1 of the Sherman Act on a theory of "apparent authority," although the society had in no way profited by the anticompetitive conduct of its apparent but unauthorized agents. The opinion noted that "(i)n the past, the Court has refused to permit broad common law barriers to relief to constrict the antitrust private right of action." Id. --- U.S. at ----, 102 S.Ct. at 1943, 72 L.Ed.2d at 341 (citing Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968)). Because the apparent authority concept was found to be consistent with the congressional intention to encourage competition, it was held to apply under the antitrust laws. Id. --- U.S. at ----, 102 S.Ct. at 1944, 72 L.Ed.2d at 342. The Court reasoned that holding the principal to antitrust liability would create a strong incentive for the principal to prevent antitrust conduct on the part of its agents. In that connection, the Court stressed "the congressional desire that the antitrust laws sweep broadly." Id. --- U.S. at ---- n.11, 102 S.Ct. at 1946 n.11, 72 L.Ed.2d at 344 n.11. Finally, the Court pointed out that treble damages were meant to deter future antitrust violations, as well as to punish particular antitrust violators, and to counterbalance the difficulty of maintaining a private suit for an antitrust violation. Id. --- U.S. at ---- - ----, 102 S.Ct. at 1947-1948, 72 L.Ed.2d at 345-46.
 
 
 51
 Equally germane is an aspect of the Second Circuit's opinion in Hydrolevel not dealt with by the Supreme Court. 635 F.2d 118 (2 Cir. 1980), aff'd, --- U.S. ----, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). The trial court had attempted to soften the blow of a treble-damage award by deducting the settlement payments of a coconspirator before trebling the damages. The Second Circuit reversed and held that settlement payments must be deducted after trebling to give full effect to the Clayton Act's express remedy. The court reaffirmed the three-pronged rationale of Flintkote Co. v. Lysfjord, 246 F.2d 368 (9 Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957):
 
 
 52
 First, the antitrust laws provide that the plaintiff should receive three times the proven actual damages. If settlement proceeds are deducted before trebling, the plaintiff's total award is less than what the law allows. Since antitrust defendants are joint tortfeasors, each is liable to complete the total deserved damages irrespective of fault. Second, ... one purpose of the trebling provision is to encourage private plaintiffs to bring suit. Any ultimate recovery totaling less than three times proven damages would weaken the statutory incentive through judicial construction. Third, deduction of settlement proceeds before trebling would discourage settlement by making litigation relatively more profitable for plaintiffs: every dollar received in settlement would cause a three dollar reduction in the judgment at trial.
 
 
 53
 Hydrolevel Corp., 635 F.2d at 130.
 
 
 54
 We think that the broad concerns of the Texas Industries and Hydrolevel Corp. decisions militate strongly against the judicial creation of an equitable defense of claim reduction in antitrust cases. They caution against implying novel limitations on the broad sweep and heavy deterrent force of the antitrust laws. And they counsel that judicial notions of fairness and equity must yield to the prophylactic policies of the treble-damage remedy.
 
 
 55
 Defendants note that the doctrine of joint and several liability was imported into antitrust law by judicial decision, rather than by express statutory command. It follows, they contend, that the statute leaves the judiciary with sufficient scope to prevent unfairness in the application of joint and several liability to treble-damage awards. As examples of the exercise of that power, defendants cite Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), and Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3 (4 Cir. 1971). In Zenith, the Supreme Court recognized in dictum that "a plaintiff who has recovered any item of damage from one (antitrust) coconspirator may not again recover the same item from another conspirator; the law, that is, does not permit a plaintiff to recover double payment." 401 U.S. at 348, 91 S.Ct. at 811. In Perma Life Mufflers, five Justices held that in pari delicto is no defense to an antitrust action, but commented that benefits conferred upon a plaintiff as a result of complicity in the defendant's antitrust violation "can of course be taken into consideration in computing damages." 392 U.S. at 140, 88 S.Ct. at 1985. In Columbia Nitrogen, we held that, under the concurring and dissenting opinions in Perma Life Mufflers, "when parties of substantially equal economic strength mutually participate in the formulation and execution of the scheme and bear equal responsibility for the consequent restraint of trade, each is barred from seeking treble damages from the other." 451 F.2d at 15-16 (footnote omitted). See note 6 supra.
 
 
 56
 Defendants' arguments are not persuasive. In engrafting the doctrine of joint and several liability onto the express remedies of the antitrust laws, courts have construed the statutes against the background of the common law and traditional jurisprudence. Defendants have failed to show that an equitable defense of claim reduction was known to the law when Congress enacted the treble-damage remedy. Moreover, the power to interpret the antitrust statutes under traditional legal principles not inconsistent with statutory policies by no means implies that courts are free to soften their construction of the treble-damage remedy on a case-by-case basis. Nor do the cases cited by defendants stand for any such power. Columbia Nitrogen did not qualify the treble-damage remedy, but rather withheld the remedy altogether under the ancient notion that the courts will not aid a wrongdoer against misconduct in which he took part. The dictum of Perma Life Mufflers merely recognized that beneficial by-products of a legal wrong must be taken into account in measuring a plaintiff's injury. And Zenith simply acknowledged the compensation principle, basic to the law of remedies, under which a plaintiff is entitled to redress his injury once in full but not a second time. All of these cases, then, were decided under long-established principles of general applicability, and not under fact-specific considerations of fairness. They provide no support for the argument that courts have discretion to vary their interpretation of the treble-damage remedy to avoid harsh results in particular cases.[9]
 
 
 57
 In short, we reject defendants' contention that claim reduction rests within the discretion of the judiciary and does no violence to statutory policies. In the form employed by the district court, claim reduction would convert joint and several liability for treble-damage awards from a legal rule of general applicability to a case-by-case determination of fairness. Such broad discretion clashes with the unqualified language of the Clayton Act entitling antitrust plaintiffs to recover their damages threefold. Moreover, whether applied selectively or uniformly, claim reduction would amount to a fundamental departure from joint and several liability, which has been the established doctrine of antitrust law for the better part of a century and which Congress has not seen fit to disapprove.
 
 
 58
 We reject also defendants' argument that claim reduction is necessary to prevent a particularly culpable antitrust violator from using settlement as an anticompetitive device for shifting liability to its erstwhile coconspirators. The Supreme Court heard similar arguments in Texas Industries, and its response is fully applicable here:
 
 
 59
 The range of factors to be weighed in deciding whether a right to contribution should exist demonstrates the inappropriateness of judicial resolution of this complex issue. Ascertaining what is "fair" in this setting calls for inquiry into the entire spectrum of antitrust law, not simply the elements of a particular case or category of cases. Similarly, whether contribution would strengthen or weaken enforcement of the antitrust laws, or what form a right to contribution should take, cannot be resolved without going beyond the record of a single lawsuit. As in Diamond v. Chakrabarty, 447 U.S. 303, 317, 65 L.Ed.2d 144, 100 S.Ct. 2204 (2212) (1980):
 
 
 60
 "The choice we are urged to make is a matter of high policy for resolution within the legislative process after the kind of investigation, examination, and study that legislative bodies can provide and courts cannot. That process involves the balancing of competing values and interests, which in our democratic system is the business of elected representatives. Whatever their validity, the contentions now pressed on us should be addressed to the political branches of the Government, the Congress and the Executive, and not to the courts."
 
 
 61
 Accord, United States v. Topco Associates, 405 U.S. 596, 611-612, 31 L.Ed.2d 515, 92 S.Ct. 1126 (1135-1136) (1972).
 
 
 62
 Texas Industries, 451 U.S. at 646-47, 101 S.Ct. at 2069-2070.
 
 
 63
 Like contribution, claim reduction raises the question whether the antitrust laws, as heretofore applied, provide excessive deterrence. The essentially legislative character of that question is heightened by the fact that Congress is presently considering a bill to establish claim reduction and contribution for antitrust defendants. S. 995, 97th Cong., 1st Sess. (1982). We decline to speculate on the fate of this bill, but we readily acknowledge that Congress, not the courts, is the forum where the decision whether or not to recognize the defense should be made.
 
 
 64
 We conclude that the district court erred in recognizing the defense of claim reduction. On remand, defendants should be held jointly and severally liable for all damages arising from their conspiracy with Leesona.
 
 
 65
 VACATED AND REMANDED.
 
 
 66
 K. K. HALL, Circuit Judge, concurring in part and dissenting in part:
 
 
 67
 It is axiomatic that a party may not profit from its own wrongdoing. Yet the majority allows Burlington to receive a windfall at the expense of the defendants even though, at the time the defendants and Leesona struck their agreement, Burlington and Leesona were already parties to a remarkably similar royalty scheme, and the conspiracy in this case merely preserved that arrangement. Burlington benefitted handsomely from its deal with Leesona, receiving secret kickbacks from its royalty payments, and thereby securing a competitive advantage over its smaller rivals. Now, however, Burlington would have us hold that it was actually damaged by Leesona's royalty program. I am astonished that my brethren would countenance Burlington's opportunistic approach to this case much less sanction a reward for such reprehensible conduct. Accordingly, although I concur in much of the majority's opinion, I respectfully dissent to Part III.
 
 
 68
 Leesona and the defendants in this case started out in the late 1950's as competitors trying to market patented false twisting machinery. They were also originally combatants in litigation which brought the validity of Leesona's patents into question, (the Whitin litigation). However, shortly before trial, in 1964, the parties to that litigation realized that they were jeopardizing all of their royalty programs; even if the Leesona patents were held invalid, the defendants still would have been unable to demand royalties for the use of their false twisting machinery in the face of unlicensed competition for Leesona.[1] Consequently, they renounced their adversarial positions and settled the Whitin litigation in order to "preserve and enhance the interdependent royalty programs which a trial ... might well have destroyed." Duplan Corp. v. Deering Milliken, 444 F.Supp. 648 (D.S.C.1977). In the liability portion of this case, that settlement, with the attendant restraint of trade, was held to be an horizontal antitrust conspiracy between Leesona and the defendants, a per se violation of § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Id., aff'd, 594 F.2d 979 (4th Cir. 1979).
 
 
 69
 Burlington and its subsidiaries, as plaintiffs injured by the conspiracy, claim as damages all of the royalties paid to the defendants and to Leesona after they conspired to block the Whitin litigation. Their damages theory is that the Whitin litigation, had it gone to trial, could have invalidated Leesona's patents and eliminated the royalty programs. However, only a year before the Whitin settlement, Burlington itself abandoned an opportunity to test the same patents which would be at issue in the Whitin case, finding its own interests better served by paying royalties to Leesona in exchange for secret rebates. Thus, Burlington's claim for royalties paid to Leesona rings hollow.
 
 
 70
 Burlington's relationship with Leesona evolved as follows: In the late 1950's, Burlington subsidiaries were using unlicensed high speed spindles manufactured by Mechanical Specialty Company. By avoiding royalties which would otherwise have been payable to Leesona, the Burlington companies enjoyed a competitive edge over smaller throwsters. In an attempt to curb this unlicensed competition, Leesona sued for patent infringement and nonpayment of royalties in consolidated cases against Madison (a Burlington subsidiary), and Mechanical Specialty (the Mechanical Specialty litigation).
 
 
 71
 The defendants in the Mechanical Specialty case were confident that they could win on the merits, convinced that the Leesona patents were invalid. Burlington was caught in a bind. If the Leesona patents were invalidated, the other throwsters would be relieved of their royalty obligations, which would eliminate Burlington's cost advantage; on the other hand, if the Leesona patents were valid, Burlington would have to pay the same royalties as everyone else.[2]
 
 
 72
 Burlington solved its dilemma by, in the words of the district court, "orchestrating" a settlement to its own great advantage. In 1963, the defendants entered final consent judgments admitting validity and infringement. Burlington and Madison paid some damages for unlicensed prior use and took Leesona licenses, agreeing to pay royalties in the future. In return, Burlington and Madison received back one third of the royalties they paid to Leesona, thereby protecting a portion of their competitive margin over Leesona's other licensees. This part of the settlement had to be kept secret because Leesona licenses contained "most-favored nations" clauses which required that all Leesona licensees be offered the same terms.
 
 
 73
 A year later, in the Whitin settlement, Leesona and the defendants in this case mutually affirmed their respective royalty systems. The kickback scheme thus firmly in place, Burlington and Madison continued to prosper from their intrigue.
 
 
 74
 In the late 1960's, the other throwsters stopped paying royalties to Leesona. Consequently, Burlington's competitive edge evaporated, and it no longer benefitted from supporting Leesona's royalty program. So, at that time, Burlington joined the other throwsters in challenging the Leesona royalty system as a horizontal conspiracy in the cases consolidated in the fifth circuit as In Re Yarn Processing Patent Validity Litigation, MDL-82. Burlington never revealed in that litigation that it had been instrumental in preserving Leesona's royalty program, nor that it had been the beneficiary of the one-third rebates which it was so stridently denouncing as illegal.[3]
 
 
 75
 Burlington and Leesona settled their differences in the In Re Yarn Processing case. Burlington recovered only a fraction of the damages claimed in that case, but would have the defendants in this case make up and treble the difference.[4] The district court ultimately refused to sanction Burlington's attempt to hold these defendants accountable for the royalties paid to Leesona. The amended judgment subtracted all of the Leesona-based damages on the theory that Burlington had bargained away its claim to damages from Leesona's royalty program when it settled the In Re Yarn Processing case for such a small sum.
 
 
 76
 I agree in principle with the district court that, on this basis alone, we should have an appropriate case for claim reduction. However, the majority's conclusion in Part VIII of the opinion is unassailable: the defense of claim reduction is not available in antitrust cases.
 
 
 77
 Yet that answer is not dispositive of this case. A more fundamental principle of our jurisprudence is that a party may not profit from its own inequity or take advantage of its own wrong. Cardozo, The Nature of the Judicial Process at 41.
 
 
 78
 The majority sloughs off the defendants' attempt to show that Burlington caused a large portion of its claimed damages by saying that this issue is one of liability rather than damages, and thus cannot be considered at this time. At 387. In my view, this claim, which potentially involves two-thirds of the damages, deserves more than the majority's pat dismissal.
 
 
 79
 Moreover, the majority has missed the point. This is not a situation of in pari delicto. The conspiracy between Leesona and Burlington is not the same as the conspiracy between Leesona and the defendants here. Burlington had no direct part in the conspiracy in this case. Thus, it was not necessary to go into the background of the relationship between Leesona and Burlington in order to determine liability for the conspiracy between Leesona and the defendants.
 
 
 80
 Now we are considering the very different question of whether to award damages to the extent of all royalties paid to Leesona and the defendants after the Whitin settlement. Regardless of the defendants' potential liability, I would not permit Burlington to recover any of the royalties paid to Leesona. Burlington engineered the Mechanical Specialty litigation settlement with Leesona, and designed the royalty-kickback machinery for their mutual benefit. The Whitin settlement between the defendants and Leesona simply perpetuated that compact. Burlington now should not be heard to complain that it was actually harmed by its own scheme-a scheme different from the one the majority finds to have been disposed of in the liability portion of this litigation.
 
 
 
 [1]
 As originally instituted, the litigation involved charges of a vertical antitrust conspiracy, patent misuse, patent validity and infringement and nonpayment of royalties. These aspects of the case have all either been finally decided or superseded by the finding of the horizontal conspiracy
 
 
 [2]
 In the instant case, the fact of damage, an essential ingredient to a showing of antitrust liability, was conclusively established in the liability phase of the trial. We are concerned now only with the measure of actual damages
 
 
 [3]
 When this litigation began, Madison was Burlington's wholly-owned subsidiary. During the litigation Madison was merged into Burlington
 
 
 [4]
 Defendants offered to substantiate this theory by showing that if Leesona had lost its right to collect royalties, it would have increased the lump-sum purchase price for its machines, because "(t)he price of our machinery has always been a combination of machine price and royalty"; that Leesona could have collected royalties on other patents even if the patents safeguarded by the conspiratorial settlement had been invalidated; that market demand was so strong that Leesona could have raised prices by as much as 20%; that DMRC could have exacted a premium even if Leesona's patents had been invalidated, since DMRC's machines were cheaper to operate than those of Leesona and therefore supported a higher royalty; that DMRC and Chavanoz could have extracted paid-up royalties to replace production royalties, in which case Whitin would have been forced to raise its prices; and that price increases by defendants would not have induced substantial foreign competition
 
 
 [5]
 We, of course, have no occasion to pass on the admissibility or persuasiveness of particular items of evidence contained in defendants' proffer. Those are matters for the district court to decide on remand
 
 
 [6]
 In Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the opinion for the Court indicated that the in pari delicto defense is unavailable in antitrust litigation. See id. at 140, 88 S.Ct. at 1985. Five concurring and dissenting Justices, however, either rejected this view or accepted it only with substantial qualification. Under the concurring and dissenting opinions in Perma Life Mufflers, this circuit continues to recognize a narrow version of the defense. See Columbia Nitrogen Corp., 451 F.2d at 15-16. See also 15 J. von Kalinowski, supra, § 109.02 (taking the view that the in pari delicto defense remains viable after Perma Life Mufflers ). But see Mechanical Engineers, Inc. v. Hydrolevel Corp., --- U.S. ----, ---- - ----, 102 S.Ct. 1935, 1943-1944, 72 L.Ed.2d 330, 341-42 (1982) (citing Perma Life Mufflers for the proposition that broad common-law defenses should not be permitted to hamper private rights of action under the antitrust laws)
 
 
 [7]
 Plaintiffs argue that if any set-off for support services was appropriate, the deduction should have been made after trebling the damages. This argument, however, is inconsistent with the basic premise that plaintiffs cannot claim injury to the extent that they received value in exchange for the royalty payments
 
 
 [8]
 This methodology and its rationale were cogently summarized in Wainwright v. Kraftco Corp., 58 F.R.D. 9 (N.D.Ga.1973):
 (A)n antitrust plaintiff may choose to sue but one of several co-conspirators, and that one co-conspirator will be responsible for the entire amount of damages caused by all. Of course an antitrust plaintiff may not recover double payment, and if during a case an antitrust plaintiff recovers an item of damage from one co-conspirator through a release he may not recover that same item later from another co-conspirator still in the case. This does not, however, diminish the responsibility of each co-conspirator for the entire amount of damages. Thus if an antitrust plaintiff sues four co-conspirators alleging $100,000 damages, and during the suit three of the co-conspirators are released upon a total payment of $50,000, and the jury returns a verdict assessing damages at $100,000, as a matter of computation the remaining co-conspirator is liable for the entire amount of damages trebled-$300,000-and his defense of payment will result only in a deduction of $50,000 from the trebled amount, leaving him with a liability of $250,000.
 Id. at 12 (citations omitted).
 
 
 [9]
 Indeed, defendants' claim reduction theory clashes directly with the Zenith decision. The Zenith Court held that when an antitrust conspirator settles with a plaintiff and obtains a release, the release does not insulate co-conspirators from liability unless the parties to the settlement so intend. 401 U.S. at 347, 91 S.Ct. at 810. This rule was adopted to promote partial settlements of antitrust cases involving multiple parties. See id. It is undisputed here that, in entering into the Leesona settlement, plaintiffs expressly reserved their right to proceed against defendants. Yet the district court disregarded plaintiffs' intent and ruled, in effect, that the settlement relieved defendants of joint and several liability. To allow the district court's decision to stand would scuttle the policy articulated in Zenith by giving antitrust plaintiffs a powerful incentive to avoid partial settlements
 
 
 [1]
 Robert Leesona, president of Leesona, convinced Norman Armitage, an officer of DMRC, that the Whitin litigation should be settled, saying, "(T) here is more at stake than the cost of a suit. If you win, you lose, and if you lose, you lose-because if the patent is broken, there will be no royalty." 444 F.Supp. at 680
 
 
 [2]
 Thus, Burlington was faced with the same sort of choice which would precipitate the Whitin settlement. See footnote 1 and accompanying text
 
 
 [3]
 Leesona raised an estoppel defense, but the case was settled before that issue could be fully aired
 
 
 [4]
 Burlington asserted claims in the MDL-82 litigation aggregating $26,000,000, but released Leesona for $789,683. In this case, Burlington claims damages based on the royalty payments to Leesona (after subtracting the amount received from settling the In Re Yarn Processing case), amounting to $13,439,793.72