## PICK MFG. CO. v. GENERAL MOTORS CORPORATION et a'
### No. 5292.

Circuit Court of Appeals, Seventh Circuit.
Dec. 19, 1935.

Before SPARKS and ALSCHULER, Circuit Judges, and LINDLEY, District Judge.

Carl B. Rix, of Milwaukee, Wis., for appellants.

Henry S. Rademacher and Thomas F. Howe, both of Chicago, Ill., for appellee.

LINDLEY, District Judge.

This is an appeal from a decree dismissing for want of equity a bill of complaint alleging violation of the provisions, particularly section 3, of the Clayton Act, 15 U.S.C.A. § 14.

Appellant manufactures and sells replacement parts for various kinds of automobiles, including those manufactured and sold by General Motors Corporation and its subsidiaries. General Motors manufactures, and its subsidiaries, the Buick Motor Company and Chevrolet Motor Company, sell automobiles. They also manufacture, and have manufactured by others, according to specification, and sell repair and replacement parts for such automobiles. Certain other subsidiaries make and sell to the trade, generally, replacement parts for cars other than those built by General Motors. In the sale of such parts, therefore, appellant and appellees are competitors.

Each contract of the Chevrolet Motor Company with its distributor of, or dealer in, Chevrolet cars and replacement parts contains substantially the following: "Dealer will agree that he will sell genuine, new Chevrolet parts and accessories at not more than the current list price issued by seller. Dealer will agree that he will not sell, offer for sale, or use in the repair of Chevrolet motor vehicles and chassis, second-hand or used parts or any part or parts not manufactured by or authorized by the Chevrolet Motor Company, division of General Motors Corporation. It is agreed that dealer is not granted any exclusive selling rights in genuine Chevrolet parts."

The contract of the Buick Company is to the same effect.

Appellant contends that the inevitable effect of these provisions is to prevent dealers in General Motors cars and replacement parts from purchasing and using for General Motors cars replacement parts manufactured by appellant and other independent makers of such parts; that competition in the sale of replacement parts is and will be thereby substantially lessened and decreased; and that, therefore, the contractual provisions are in violation of the Clayton Act.

Appellees deny that the effect of the contractual provisions aforesaid is or will be to lessen competition in the sale of replacement parts, or that any monopoly was attempted or intended or has, in fact, resulted or will result.

It appears in evidence that General Motors gives the purchaser of each of its cars a warranty against defects in material and workmanship for a period of 90 days, or until the vehicle has been driven 4,000 miles, whichever event shall first occur, and that the warranty does not apply to any vehicle which shall have been repaired or altered so as, in the judgment of the manufacturers, to affect its stability and reliability. Appellees contend and the trial court found that the provisions in the agreements with dealers complained of are, therefore, reasonable and necessary to further and protect their business as well as the interests of buyers of cars of their manufacture.

The District Court said: "That the provision in the contracts with its dealers, whereby the dealer agrees not to sell, offer for sale or use in the repair of automobiles for which he is a dealer, second-hand or used parts or any part or parts that are not genuine or authorized is entirely appropriate and legitimate in carrying out the above mentioned warranties, policies or obligations of the manufacturer to customers and to others and is proper and reasonable in the furtherance and protection of its business. That the effect of the complained of clause in the dealers' contracts has not been in any way to substantially lessen competition or to create a monopoly in any line of commerce, and the contract is not in violation of * * * section 3 of the Clayton Act."

In the restatement of the law of contracts of the American Law Institute, c. 18, § 516, p. 1001, the legal effect of the Clayton Act is simply defined as follows: " * * * If a seller * * * is engaged in interstate commerce it is illegal to sell or to lease on the condition or

agreement that the purchaser or lessee shall not use or deal in the goods of a competitor if the effect of the agreement will be to lessen competition substantially."

With this statement we are in accord, and the cases relied upon by appellant, we believe, support the same and do not negative validity of the contractual provisions now under consideration.

Thus, in Lord v. Radio Corporation (D.C.) 24 F.(2d) 565, affirmed (C.C.A.) 28 F.(2d) 257, certiorari denied, 278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 560, Radio Corporation was the manufacturer of a patented circuit for radios. It granted to competing manufacturers of radios, licenses to manufacture these circuits, with the condition that the competing manufacturers buy also from the manufacturer, and place in the radios made and sold by the licensee under the license, tubes which the licensor alone manufactured. This the court found to be in direct conflict with the provisions of the Clayton Act, i. e., illegal, because made on the prohibited condition that the purchaser "should not use or deal in the goods of competitors." The effect of the agreement was substantially to lessen competition.

In the present case, appellees are not licensing or selling to competing manufacturers. They are selling automobiles to their designated dealers, making to the purchasers from such dealers certain warranties, and endeavoring to preserve the good will of the buying public.

True it is that the express warranty is limited to a period of 90 days or until the car has been driven 4,000 miles. Obviously, either period is only a small part of the operating life of an automobile. Consequently, it would seem that this warranty can be a basis for exception to the applicability of the Clayton Act only for the period thereof.

But there are certain other material facts. Repairs will be made after the expiration of the 90-day period. They are necessitated by natural wear, tear, and breakage. In the minds of the owners, the cars are identified and associated with the manufacturer. If defective or inefficient repairs or replacements should be made, and the cars, as a result, should operate unsatisfactorily, the owners' recollections will naturally and inevitably re-

vert to the specific name and manufacturer thereof. Defective parts, preventing efficient operation of cars, bring dissatisfaction with the automobiles themselves. The natural result is blame of the manufacturer and consequent loss of sales.

The automobile is a complicated mechanism, the refined product of scientific engineering after long investigation, close competition, experiment, and practical experience. Replacement and repair parts must be of accurate measurement, appropriate, satisfactory material, and proper mechanical construction. Otherwise, disaster may result. Appellees insist with their dealers, therefore, that the latter shall not repair appellees' product with used or secondhand parts or with parts other than those manufactured by appellees, or for them under their specifications, for the express purpose of replacing parts in or repairing their product. These dealers may repair any make of automobile, and in doing so they may employ parts manufactured by appellant or any other independent manufacturer, provided the car being repaired is not appellees' product. The restriction is applicable only to appellees' cars. Clearly this protects appellees against the otherwise possible use of defective parts in repairing or making replacements in their products. The preservation of the good will of the public is directly involved.

These facts bring the case within the language of United States v. United Shoe Machinery Co. (D.C.) 264 F. 138, 167, affirmed 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708. There the lessee of shoe manufacturing machinery covenanted that it would procure only from the lessor all duplicate parts needed or used in repairing the leased machinery. The court remarked: "In the opinion of the court there is nothing unreasonable in this provision. The evidence shows that most, if not all, parts of these machines, are very delicate, and unless perfectly adjusted will, if not entirely, at least very seriously, prevent the proper operations of the machine, and in some instances prove ruinous, necessitating costly repairs, thus depriving the lessee of a full output, and the lessor of royalties. They may also cause dissatisfaction with the machines, owing to the decreased and unsatisfactory output. The parts furnished by the de-

644

fendants are all standardized and fit perfectly, so that by replacing broken or worn-out parts with the parts made by defendants, the machines will perform the work in as satisfactory a manner as a new machine."

The reasoning of the Supreme Court in Federal Trade Commission v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746, is in accord.

Furthermore, the record shows that competition in the sale of replacement parts for automobiles instead of growing less has substantially increased through the period during which the provisions complained of have been in force and, while it may be that competition would have increased more rapidly in the absence of such provisions, the trial court rightfully concluded that such was not the "substantial lessening of competition" which the Clayton Act was designed to prevent. Thus in Standard Oil Company v. Federal Trade Commission (C.C.A.) 282 F. 81, 86, affirmed 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746, the court said: "The Clayton Act, which is a part of the scheme of laws against unlawful restraints and monopolies, does not wait for its operation until monopolies have been created and restraints of trade established, but seeks to reach them in their incipiency and stop their growth. Yet, in thus avoiding an objectionable effect by removing the cause, the Congress did not intend the statute to reach every remote lessening of competition or every dim and uncertain tendency to monopoly. It intended rather that the Commission, and ultimately the courts, should inquire not whether a given practice may possibly lessen competition or possibly create a monopoly, but whether it probably lessens competition—and lessens it substantially—and whether it actually tends to create a monopoly."

We believe that the covenants complained of protect appellees in their warranties of automobiles and in their continued sale thereof with the intent to promote and preserve the good will of the purchasing public, essential to business success; and that they do not and will not lessen competition substantially, within the meaning of the act, or tend to create a monopoly.

The decree is affirmed.